Tell us who you are and who you represent. For the echelon. Good morning, your honor. Dan Belcher, V-O-E-L-K-E-R, on behalf of the defendant's appellants, Mark Anderson, Greg Trapani, Walter Kaiser, and Jordan Kaiser. For the city village. Good morning, your honor. Jack Siegel for the plaintiff village of Arlington Heights. Each side has 15 minutes. Unfortunately, I have to keep close to that because I'm due in another courtroom at 11 o'clock for another oral argument. So, I can assure you we've read the briefs and the pertinent portions of the record. We're familiar with the facts. So, we'd really appreciate it if you get your strongest points first. Anytime you're ready, Mr. Poker. Thank you, your honor. Thank you. May it please the court. Counsel, my name is Dan Belcher. I'm here on behalf of the appellants, Mr. Anderson, Mr. Trapani, and the Kaisers. This appeal comes before you on the trial court's grant of summary judgment against the appellants on both issues of liability and damages. Of course, it's an issue that the court can look at and resolve on a de novo basis. The issue on the appeal is whether or not the trial court erred in admitting evidence from the Cook County Treasury Department consisting of computerized, generated treasury reports. Just a brief background, if your honors would like a little background. This case involves work that my clients did for the village in connection with the redevelopment of the village of Arlington Heights. It was a TIF district. My clients were responsible for the construction of commercial and residential buildings. In connection with that project, they assigned the developers note whereby they agreed that over the life of the project that the incremental taxes, the increased incremental taxes, the actual taxes would exceed the projected taxes. To the extent that those did not, that the actuals did not exceed the projected, they agreed to make up the deficiency over the life of the project. In 2008, the village of Arlington Heights filed suit to recover the deficiencies for years 2003 and 2004, amounting to approximately $290,000 with interest. It's undisputed in this case that the actual incremental taxes that were collected by the village of Arlington Heights exceeded the projected taxes over the life of the project. That summary motion was heard by the court and was granted on both issues of liability and damages. I'm going to start with the issue of damages if I could. We contend, and I think it's a very strong argument, that the court erred in granting summary judgment on the issue of damages because she accepted and admitted into evidence records of the Cook County Treasurer's Office for which there was absolutely no foundation whatsoever laid or attempted to be laid by the plaintiff. So you're objecting on the basis that it's hearsay and so it needed a foundation. What's the basis of your objection? The objection, Your Honor, is that we acknowledge in Illinois that public records are an exception to the hearsay rule, and you would be able to get around the hearsay exception because they are public records and we stipulate they're public records. There was no doubt they came from the Cook County Treasurer's Office. The problem is they're computer-generated documents that are vague and ambiguous on their face, and it's unclear what they demonstrate. So does the fact that a public record is computer-generated take it outside the exception to the rule? Well, it does, Your Honor. There's a second district case that says that any computer-generated documents, public record documents are admissible into evidence only if a proper foundation is laid as to the accuracy of the equipment generating the report, that the information is being generated close in time to the actual calculations involved. Other various, the fact that it says the second district case specifically requires that the entries are made in the regular course of business at or reasonably near the time of the happening of the event. Isn't that splitting hairs though? In this day and age, just about all of those documents, many documents of the kind that we would be talking about here will be computer-generated. So are you saying that based on that second district case, which I'm familiar with, but I don't agree that the case says that every computer-generated document has to have, is outside the exception and therefore has to have, you have to drag the, whoever inputted the information in to pacify. I don't think that's what that case says. Well, I don't think that, that isn't necessarily the key to our position here, Your Honor. Our position is a marriage license, a driver's license, we all know what those look like and what they mean. And one would need to lay very little foundation to be able to understand what that document says because on its face it says what it says. However, these particular documents that were created by the Cook County Treasurer's Office are sui generis in the sense that it's a document that they prepared at this point in time for some purpose unknown to us. It's not clear what they mean. For example, it says there's a balance due, then it says the amount due. There are handwritten notes on the documents that are purportedly from the Cook County Treasurer's Office that contradict the electronic information in the documents. So at the end of the day, it's not clear what these documents mean or what they say. And it would be impossible for Mr. Enright, who works for the village, to be able to take these documents and synthesize them and create some kind of an amount that's due to the village. The problem was that the plaintiff in this case failed to take a deposition of someone with the Cook County Treasurer's Office so that they would understand, so we would all understand what these documents purport to even show. Excuse me, Mr. Vogt. If Mr. Enright testified that he routinely relies, just excuse me for a moment, on these documents that come from the County Treasurer's Office for purposes that are at issue in this case, not specifically this case, but are at issue in this case, do you think that that's satisfactory? I mean, he didn't get these documents. He got these just for this case, but I believe that he testified that this is a routine thing that he does in his capacity and so on. Well, Your Honor, I think the trial court got it wrong. The trial court said these are business records of the village, and therefore they're admissible. That's not the test. The test is whether or not they are business records of the public official and they're created in the ordinary course of business of the public official. That's what gives them reliability. The court clearly got it wrong. If you look at page 4 of her decision, she says they're not business records of the village. Wouldn't the county treasurer be a public official and these are business records of the county treasurer's office? If there was evidence that would support that fact from the county treasurer, that would be correct, but there is no evidence in the record from the county treasurer to that effect. We're basically saying that your argument, as I understand it, is unless they bring in somebody from the county treasurer's office, these records are never going to be admissible.  That's absolutely correct, Your Honor, because you cannot tell by looking at the documents what they mean. Do they mean what's still owing? Do they mean what's being paid? Why is there handwriting that contradicts the electronic information in the document? And it is the plaintiff's burden on summary judgment to lay foundation for the admission of this evidence. It's an evidentiary rule that is followed, I think, by every court in the country, that foundation is the duty of the proponent of the person introducing the evidence. And here, the plaintiff completely failed to even make a try to lay foundation. Instead, just read the records to mean what they wanted them to mean. And that's just not correct. Neither party cites the Illinois Rules of Evidence adopted about a year ago by our Supreme Court, and in 902 or 903, subsection 8, it refers to public records as being an exceptionally hearsay rule. And it says in print, in part, that records, reports, statements, or data compilations in any form of public offices or agencies setting forth A, the activities of the office or agency, or B, matters observed pursuant to duty imposed by law as to which matters there was a duty report, and excludes police reports, et cetera, unless the sources of information or other circumstances indicate lack of trustworthiness, which I would suggest to you puts the burden on the opponent of the person trying to keep out the public records. These records were kept. Now, you're trying to say, you're arguing in this court, that your clients were, I would assume, highly experienced developers and business people, don't understand the records put together by the county assessor. These reports are required under the TIF Act, which is found in 65 ILCS 5-11-74.488, requiring specifically these types of things. I mean, exactly these reports, referring to these reports as being required to be looked upon by the chief executive of the village. Then the village has to do an audit, and then they're to submit these reports in order to keep their TIF clearance with the state of Illinois. I don't deny at all, Your Honor, that there is a public records exception to the hearsay rule. There's no question about that. And I agree with everything you just said. Our point is that hearsay, even if you can get over the hearsay exception, you still have to lay foundation for what the document is in order to be able to put into the evidences what it means. These documents. That makes no sense. I mean, I'm, you know, sorry to make that point, I should say. So in your theory, we should write a case, not just for your case, but for every case, saying every time a tax document is admitted into court, unless the proponent of that tax document deposes the clerk, or rather the county assessor, or a significant individual in the assessor's office, the courts cannot recognize these tax records. Well, no, I wouldn't go that far. You just said you did. I'm not trying to lock you in. I'm trying to show the absurdness, frankly, of how can that be. I think, Your Honor, if the court has and if it will, take a look at these documents. They're in our appendix. They're attached to our brief. They are vague. They are ambiguous. They are inconsistent. There is no way Mr. Enright could read these documents without the assistance of someone from Cook County Treasurer's Office and determine what they mean. But if you're checking the content, you've checked the content. You have experts. I don't. Check the content. What does this mean? You can call the other side. Nothing is preventing you from calling the county assessor's people. What does this mean? I agree with that. But I think that burden is really important. I think that it's the burden of the proponent that offers documents and the evidence to lay the foundation for those documents. Except our new rules specifically say that's not so. In all due respect, I didn't see, Your Honor, where that rule said that foundation is no longer a required element of admission. It's admissible as exceptional hearsay unless the sources of information or other circumstances indicate lack of trustworthiness. And I agree with that. I agree that it's admitted over the hearsay exception. But the cases in Illinois, every case in Illinois that I've read, that we've said in our brief, still requires that there be foundation for the Counsel, would you then have to show a lack of trustworthiness in order to raise the point that you are, that Justice Quinn asked you about? I mean, your argument is that the court can't admit these documents under any circumstances unless there's foundation. The rule says something different. The rule shifts the burden to you. If you object to the admission and you're kind of suggesting that the substance of the documents may be questionable because they're so confusing, but then wouldn't you have a burden, the duty to raise that issue so that the trial court would then have a basis for determining whether or not these documents are admissible? And you didn't raise that with the trial court. Your Honor, respectfully, our position is that the duty to lay the foundation for documents, whether they're public records or not, is the duty of the proponent of the evidence, trying to admit the evidence into the record. Excuse me, Counsel. Yes, sir. As I understand it, Pertell is still the law, and we are here in a summary judgment posture, and you're saying you have absolutely no duty whatsoever. Faced with this summary judgment motion, after reading their affidavits, you're saying you had no obligation at all to come up with a contrary affidavit? That's correct, Your Honor. Pertell says uncontroverted facts are admitted. Our position, Your Honor, is the evidence that supports the affidavit is inadmissible, which makes the evidence in the affidavit irrelevant, inadmissible, and having absolutely no value. So we're attacking, we're not attacking the methodology that was used by Mr. Enright. We're attacking the evidence he relied upon for which there was no foundation laid. The document on its face doesn't even say what he says it says. So I don't believe you need an affidavit to attack opinions made by an affiant that, on the face the documents he relies upon, is inconsistent and doesn't follow. It's a non sequitur. So on that issue, as I said, we believe that, notwithstanding the fact that these records are public and they're admissible as public records, that they still have to be a foundation laid for the document. That may not be the case with a marriage certificate or a driver's license because, on its face, it's clear. These are computer-generated documents for which there was no testimony as to their reliability, as to their accuracy, as to who prepared them, how they prepared it, for what purpose. You have a second issue regarding whether it's annually or there's later records. I do, Your Honor. Thank you. I'll be brief on that as well. Basically, the court also granted summary judgment against the defendants on the grounds that, under the note, that our clients had a duty to make up for any shortfall between the projected incremental taxes and the actual incremental taxes. In 2003 and 2004, admittedly, according to the documents that Mr. Enright prepared, there was a deficiency of about $250,000 plus interest for $290,000. It's our position under the terms of the note, the note says that the developers guarantee that for the life of the project, the incremental taxes, actual taxes will exceed the projected taxes. And it's undisputed that, in fact, during the life of the project, the actual incremental taxes did exceed the projected taxes. In 2008, notwithstanding that, the plaintiff filed a lawsuit claiming that they were entitled to a judgment against the developers for the deficiencies in those two particular years. I suggest, Your Honors, that the term of that note at least is ambiguous as to whether or not the calculation is done annually and credit is not given for future periods or whether, looking back, it's done over the life of the project. And since there's an ambiguity, in our view, the court should not have decided the case in summary judgment. But taking your – agreeing with you, and if we send it back, what evidence would you put on to show it's how to interpret a contract, right? So it would be one paragraph, one or two paragraphs, how there to decide whether or not to pay this in the name of an argument that is to be determined and sent out notices every year. What would you argue? What would you present to a jury or a trier of fact to say – to support your position? Well, I put my – Other than the two paragraphs. I put my clients on the witness stand, Your Honor, to testify that it was their understanding that the – what the village was trying to do was to make sure that over the life of the project there wasn't a deficiency. And there were conversations to that effect. And because the prologue in short wouldn't be a bar because there'd be – there's an ambiguity, and therefore, as I understand the law, they could testify to that. And then that would be evidence the jury would consider to decide whether or not they had actually guaranteed every single year and were never given the benefit of any kind of a surplus, or whether they truly agreed that they would guarantee it for the life of the project. If, in fact, the jury would come back and say it was guaranteed for the life of the project, I think that, in fact, my clients would prevail, and it would be the end of the case. So for those reasons, Your Honor, I would ask that this Court reverse on the issue of both liability and damages. You'll have time for reply as well. Thank you, Your Honor. Thank you. Mr. Siegel. May it please the Court. Summary judgment was properly granted because there are no controverted material issues of fact. The argument which is made here is really based upon the fact that there are no contra affidavits. The affidavits of Mr. Enright, two affidavits, one in support of a discovery which we propounded in January of 2010, which included all the records beginning in 2000 from the county treasurer, in which Mr. Enright indicated the manner in which he determined the incremental revenue, and finally his affidavit in support of our motion for summary judgment. Those affidavits were never controverted. The case law is absolutely clear on this. The statements of Mr. Enright have to be considered as factual. You cannot defeat summary judgment based upon pleadings. The pleadings in this case are very interesting as far as the answer is concerned. This is all in the record. The only defense to our complaint was the conclusion we don't owe him any money. That's all they said, if you read the answer. They conceded that the note was signed. They conceded that it was part of the redevelopment agreement. There was no issue here ever raised as to the correctness of the computation. If you look at Mr. Enright's affidavit, he was very clear as to how he went about it. I cite you Paragraph 7 through 10 of his affidavit, which was attached to our motion for summary judgment, in which he took it line by line and indicated how he arrived at the conclusions he did. Nobody has ever argued that the numbers were incorrect. Your Honors, beginning in 2005, we submitted to the plaintiffs the basis upon which the village had computed the deficits. We also submitted the documentation for the bond issue, which supported the $5,750,000 which was granted to them for eligible costs. And the reason that the note provided for annual payments was that we had to make annual payments on that bond issue, $450,000. We borrowed the $125,000 from the general funds of the village. That's why we insisted on that note for annual payments. And Your Honors... If you know, Mr. Siegel, does the TIF Act also require annual reports indicating how much money is collected? Absolutely, and that's what we did beginning in 2005. Attached to our motions are the letters from Mr. Dixon, the village manager. Two letters, each in 2005, reporting on the revenues that we received. 2006, again from Dixon. There are two letters in 2005. One is in response to Mr. Anderson's inquiry. At that point in time, we provided Mr. Anderson, who was one of the defendants and was a principal of the development, with the numbers from the county treasurer's office. We provided two letters in 2005, another letter in 2006. Mr. Keeney, the finance director, 2007. All of these letters are in the record. They're in support of our motion for summary judgment. Those numbers have never been challenged. Now, counsel talks about the fact that there are notations on some of the records and references to amounts due. The fact of the matter is, Your Honor, that we did not use the tax due computations. If you look at Mr. Enright's affidavits, and I refer you to paragraphs 7 through 10, he assumed the full payments. If the taxpayer didn't pay, in fact, the incremental revenues would have been less, and the defendants would have owed us more. So this argument that we didn't indicate whether they were full payments or not is specious, because it doesn't go to the facts in this case. The unrebutted facts, as indicated in the affidavits. Now, bear in mind, we began giving them this information in 2005 based upon the 2003-2004 tax receipts. They had three years before they attempted to somehow impugn Mr. Enright's affidavits. Enright gave them a spreadsheet. If you look at the August 2005 letter from Dixon, you'll see the spreadsheets. You'll see a portion of the county treasurer's records. Now, this is really, in a sense, an evidentiary case, if you listen to counsel's argument. He claims we didn't lay a foundation. Well, of course we laid a foundation. Foundation was the affidavit of Mr. Enright, who began in 2002, 2000, pardon me, to compute these deficiencies. And he explained how he got there. He explained the records from when the TIF was created in 2003. All of this is unrebutted. If it wasn't true, they should have said so. I took the depositions of all the defendants in this case. And I cited Mr. Trapani's deposition in support of our motion for summary judgment because he said exactly what they all said. They turned over the letters to their TIF consultants and their lawyers. Their TIF consultants were Kane McKenna, who are recognized. But we didn't see any affidavits. We didn't see any documents where Kane McKenna said this was wrong. But they knew exactly what was going on here. And, as Your Honor is well aware of, the question of admissibility of evidence. And here we're not really talking about evidence per se. We're talking about affidavits, which are unrebutted. But assuming that his argument is against the county treasurer's records, which I think Your Honors have already discussed, was there an abuse of discretion on the part of the trial judge in allowing these public records under Rule 236 and under the common law, which I cited extensively in our briefs? Was there an abuse of discretion when Judge Pantley decided that these were the records kept by the county treasurer, transmitted as they had to be transmitted, for us to determine the incremental revenues which the defendants understood? And they participated in the note. I did not draft the note. They, with their TIF consultants, drafted the note. That's not in the record. But the fact of the matter is that their TIF consultants were aware back in 2005, according to Pantley's deposition, of the basis upon which we were computing. The affidavits of Enright are absolutely clear. He talks about taking the Equalized Assessed Valuation as it existed in 2000, in, let me get it straight, in 1983. And he based the incremental revenues from the TIF district, and the village green parcel is only a portion, small portion, the overall TIF district. He was able to compute what the incremental revenues from the village green parcels were when they were undeveloped in 1997, when our redevelopment agreement was first enacted. And he eventually ended up coming up with the Fourth Amendment, which allowed the defendants to, they didn't have to pay anything under the first, they didn't have to pay the tax differences for the first several years. Is that right? Because nothing was built. Nothing was built. It was only, if you look at the documents from the county treasurer's office, which are part of this record, you will see that there was nothing until the buildings went back on the tax rolls. Incidentally, we do not concede that the taxes from village green exceeded our contributions. Quite the contrary. We've never conceded that because it isn't the fact. They never even completed the project. They sold off one of their building sites. That's for another day. That's not for this case. But for counsel to say that we conceded that the tax exceeded, of course we didn't. We had to do it annually in order to pay off the principal and interest on the bonds. That's why we insisted on this note. And the redevelopment agreement was amended four times because these folks never lived up to their construction schedule. That's why this problem existed, because the properties did not go on the tax rolls because they didn't meet their time schedule. And we amended it four times for them in order to accommodate them. So to argue that somehow our revenues exceeded what was anticipated, they did two out of the three buildings. Now, there's nothing contradicting any of these records. As I indicated to you, Enright did not use the tax due column, which they exploit in their brief as an example of the confusion. There's nothing confusing about these records. They talk about, well, they don't know whether everybody paid their taxes or not. As I indicated, if they didn't pay the taxes, then we got less money. We assumed, Enright assumed, everybody's going to pay their taxes. He gave them the benefit of the doubt if somebody didn't pay the taxes or somehow the taxes were reduced. We assumed that everybody paid the taxes, which were recorded on the county's records. Now, the law is pretty clear, and I think your honors have already addressed it. The public records of a county treasurer are admissible. We laid a proper foundation. Enright was familiar with them. They were received by the village as they came out each year as required in order to make the TIF Act work. There's no mystery about this. I don't know, I don't think there's little old men with green eyeshades sitting on high stools writing out the tax records of the county treasurer anymore. Maybe there were when I started, but they don't do it anymore. They use computers. And these 30-year-old cases mean absolutely nothing. Your honors can take judicial notice that this is a computer age. I don't think there's a county record that isn't computerized. If there isn't, it should be. But most of all, and this is the heart of this case, there is no contradiction. There is nothing confusing about those records. The defendant's own TIF experts, as testified by Trapani and testified by the others, I didn't use the other three depositions because the answer was the same. When they got these letters, and these are people who are in the business of development, these four guys have done more development than probably any four in the Chicago metropolitan area. These are not strangers. These are not innocents. They knew exactly what was going on. They turned over these numbers to their lawyers. Not Mr. Volker. He wasn't the lawyer. Otherwise, this might not have happened. But they turned over the records. They turned over the village's letters to their TIF experts. I was waiting, I was waiting for somehow or other for an affidavit in response to my motion from summary judgment from Kane McKenna or Barbara Schlicke, the guy that Trapani mentions. I was waiting for that affidavit saying, oh, this is all wrong. There was no such affidavit because we were right. There are absolutely no controverted issues of material fact in this case. The judge did not abuse her discretion knowing that these are records and the law is clear. The county treasurer has no reason to somehow phony up the records. I cited the old textbook on evidence in my brief. There's a presumption that a public official who keeps records in the ordinary course of their business are correct. And it's up to them to show. They could have done it if they really believed that these records were not correct. I'd have to ask you to wrap it up, Mr. Segal. I will wrap it up by saying that the village gave these folks $5,750,000 to get their project off the ground. The whole concept of the redevelopment agreement was we were going to be paid back annually. And interestingly enough, Judge Pantley early on, by an opinion, I think it was in 2009, which was not appealed from, found and it's in the rig. The order, her opinion was that the clear language of the note indicated these payments would be made annually. Every year, the village was appealed. We did. I ask that the decision of the trial court be affirmed. Thank you, Mr. Segal. Briefly, Mr. Holker. First of all, I want to touch on the last issue that counsel said about the evidence in this case is undisputed. Your opponent gave you a nice compliment. He's a good friend, Your Honor. Perhaps if you were handling the case, maybe things would have been different. He's a good friend and a good man. I appreciate that. I want to just touch upon the fact that in the record, the evidence is undisputed in our view that the net incremental taxes that were actually received for the project did exceed the projected net incremental taxes, and that's in Volume 3, C-642. But, you know, as Mr. Segal said, and this is a direct quote, he said if it wasn't true, they should have said so. How do you respond to that? What you're complaining about now is the inaccuracies. And, you know, granted, you weren't the lawyer below, but you're the only one here, so you're the only one I can ask. If it wasn't true or there were inaccuracies, there was every opportunity for the defendants to raise that. Why didn't you do it? The answer is simply, Your Honor, burden. The burden, in our view, was on the proponent of the evidence. But in a summary judgment motion, you have to defeat the affidavits by filing a counteraffidavit. That's how you raise the issue. You can't say, well, they filed one, and we don't believe it, but we won't counter it with anything. We'll go to the appellate court and argue it there. That's not how it works. Well, I would agree, Your Honor, if it was based on personal knowledge. But Mr. Enright's affidavit was based upon documents that we contend were inadmissible and that should have been admitted in evidence in the first place. I think counsel said it all when he said foundation for the Cook County Treasurer Reports was in the affidavit of Mr. Enright. And that really encapsulates the problem here. Mr. Enright cannot lay foundation for records generated by some third party. You had to have someone from the Treasurer's Office come in and testify that these are their records, this is how they were created, this is what they mean. Well, that's only one part of the question of what's true. The issue about whether or not it was annual, that was something that you're disputing now, too. And Mr. Siegel said your clients knew full well that it was annual because they agreed to it, there were sophisticated developers, it's part of the TIF, the statutory language of the TIF Act, and so they knew full well in the argument to speak it. So this issue of if it wasn't true, why didn't you say so goes to both of your issues, not just the one about whether or not the documents were properly laid in the foundation. And what I wanted to say about that, Your Honor, I appreciate you bringing that up, is that Mr. Siegel said the village insisted on annual payments. In fact, that's not what they did at all. In fact, they didn't send a letter to my clients until 2005, and they didn't bring this lawsuit until 2008 until the project was long concluded, and at what point in time the actual revenues that were generated, the incremental revenues from all the good work my clients did in building these projects, exceeded the projected revenues. So this is a windfall. If in fact, if in fact the plaintiff is allowed to, to ---- Mr. Siegel claimed the reason they waited until 2005 was they needed to have the data from 2003 and 2004 because there was, there was no data started at the beginning of the project. Well, the data was available shortly after the close of each calendar year, Your Honor. I mean, that's, I don't think there's any discrepancy about that. But my point, I guess, is that 2008 was when they brought this lawsuit. If the Court sustains that the finding of liability against them in the judgment basically it's a $292,000 windfall to the village. It was never, ever intended by the village or by anybody else. I would just conclude by saying that there's no evidence in the record as to who drafted the note. And I would also conclude by saying that this Court, I don't think is bound by any abuse of discretion standard on the part of the trial court. This is a de novo review. I think this Court is allowed to decide whether or not these documents should have been admitted without the proper foundation. I contend that there was no foundation. Thank you very much for your time. Thank you, Mr. Wilker. This case will be taken under advice.